[No. 16390.  Department Two.  July 20, 1921.]

H. P. McGLOTHERN, *Appellant*, v. THE CITY OF SEATTLE
et al., *Respondents*.[1]

MUNICIPAL CORPORATIONS (354)—USE OF STREETS—REGULATION OF
JITNEYS—ORDINANCES—POWERS OF COUNCIL. An ordinance imposing
on the city council the duty of passing on applications for jitney bus
permits is not objectionable as authorizing legislative action inde-
pendent of the mayor.

CONSTITUTIONAL LAW (113)—EQUAL PROTECTION OF LAWS—REGU-
LATION OF BUSINESS. The issuance of permits for auto stage lines
running to outlying towns and the refusal of jitney bus permits
within the city limits does not constitute a violation of the equal
protection clause of the state constitution, art. 1, § 12.

MUNICIPAL CORPORATIONS (354)—USE OF STREETS—REGULATION OF
JITNEYS—POWERS OF COUNCIL. Where a committee of the city coun-
cil, after investigating applications for jitney bus permits, reported
a resolution to the effect "that all applications now pending be de-
nied" for the reason their object was to serve districts already sup-
plied with adequate street car service, but that it be understood that
applications for permits to serve districts now without street car
facilities would be considered when received, the adoption of the
resolution by the council was in effect no more than the rejection of
existing applications and not an attempt by resolution to modify the
ordinance under which the council was acting.

CONSTITUTIONAL LAW (113)—EQUAL PROTECTION OF LAWS—CLASS
LEGISLATION—JITNEY BUSSES—REGULATIONS. The guaranty of equal-
ity of rights under the Federal Constitution (Amend. 14) is not
contravened by a municipal ordinance regulating the use of the city
streets by jitney busses.

MUNICIPAL CORPORATIONS (354)—USE OF STREETS—REGULATION OF
JITNEYS—POWERS OF COUNCIL AND METHOD OF PROCEEDING. Under the
recognized rule that, a city has the power to control the use of its
streets in the interest of public peace, safety, and welfare, it pos-
sesses authority to refuse to permit jitney bus routes to be estab-
lished in the congested business section of the city.

Appeal from a judgment of the superior court for
King county, French, J., entered November 17, 1920,
dismissing an action for an injunction to restrain en-

[1]Reported in 199 Pac. 457.

forcement of a city ordinance regulating jitney busses, after a trial on the merits to the court. Affirmed.

*W. R. Crawford* and *Morris B. Sachs,* for appellant.

*Walter F. Meier, George A. Meagher,* and *Charles T. Donworth,* for respondents.

MITCHELL, J.—Plaintiff, in his own behalf and in behalf of others similarly situated, together with a large number of other persons who intervened in the action as plaintiffs, seek to enjoin the city of Seattle from enforcing the provisions of ordinance number 40886, entitled,

"An ordinance relating to and regulating the operation of certain kinds of 'for hire' motor vehicles, prescribing penalties for the violation thereof and declaring an emergency,"

and to enjoin obedience by the city of its own resolution or action by which the plaintiffs were refused permits to operate jitney busses on certain portions of the streets of the city. A temporary injunction was granted during the pendency of the action. Upon issues joined, a trial was had that resulted in a judgment denying relief and dismissing the action. Plaintiff has appealed, and upon giving a supersedeas bond in the amount fixed by order of the court, has continued the temporary injunction during the appeal.

The portions of the ordinance pertinent to this case are as follows:

"Sec. 2. Any person desiring to operate a jitney bus shall apply to the city council by filing with the city comptroller on a form to be provided by said comptroller, an application for a jitney bus permit which application shall describe the route over which it is desired to operate, including the specification of certain fixed termini, the schedule of time upon which the same will be operated, the rate of fare (which shall

not exceed the rates hereinafter specified) to be charged, and the capacity of the jitney bus to be used.

"Sec. 3. Immediately upon the filing of an application for a jitney bus permit, as herein provided, the city comptroller shall furnish a copy thereof to the superintendent of public utilities, who shall, without delay, investigate the same and make a report thereon, in writing, to the city council, recommending either the granting of the permit applied for, with or without modification of the route, termini, schedule, rate of fare or capacity specified in said application, or the refusal of the same. Said report shall set forth fully the reasons for the recommendations therein made. Upon receipt of said report the city council may direct the city comptroller to issue a permit in accordance with the recommendations of the superintendent of public utilities, or with such modifications thereof as the city council shall specify."

Section 4 provides that every jitney bus permit shall specify the route, with fixed termini, over which the permittee is authorized to operate a jitney bus, the schedule of time upon which it shall run, etc. By section 6 there is reserved to the city council the power and authority to modify the route, termini, schedule, or rate of fare specified in any permit. Section 8 provides, among other things, against the operating of any jitney bus on the streets without having secured a permit to do so. Section 10 provides that any person violating or failing to comply with any of the provisions of the ordinance shall be deemed guilty of a misdemeanor, and, upon a conviction, punished in the manner therein specified. It is further declared in the ordinance that the then existing conditions in transportation by the "for hire motor vehicles," affected by the ordinance, were unsafe and that the public peace, health, safety and welfare were injuriously affected and would be, by the continuation thereof, without regulation, and that an emergency existed making

it necessary that the ordinance become effective from and after its passage and approval by the mayor. The ordinance was passed by the council on May 10, 1920, and approved by the mayor on the following day.

Upon the passage and approval of the ordinance, the city notified the jitney bus operators of its purpose to enforce the ordinance, whereupon these plaintiffs and others filed, between May 20, 1920, and June 1, 1920, some two hundred and nineteen applications for permits and thereafter twelve other applications were filed. At the time of commencing this suit no action had been taken on eleven of the applications, thirty-three had been granted and one hundred and eighty-seven (including those made by plaintiffs herein) had been rejected.

It is contended that the ordinance is invalid: (1) because, by § 3 thereof, attempt is made to give the council alone, not acting with the mayor, the power to regulate the use and control of the streets; while the charter of the city provides that such power is legislative in character and must be exercised by the legislative power consisting of the council and mayor; and (2) because it vests in the council alone the power to issue licenses; or, more exactly, it is contended that, under the charter, the power to issue licenses must be exercised in each and all applications for permits by ordinance to which the office of mayor pertains, rather than by resolution or order of the council alone as provided in § 3.

The views mistake the character of the act of the city council in passing upon such applications. The ordinance is the legislative expression for carrying out the charter provision, while the duty imposed upon the council to pass on applications made under the terms of the ordinance is not of a legislative nature

and may be properly exercised under the terms of the ordinance, by its order or resolution, independent of the mayor.

It is claimed that, because of possible inequalities in the enforcement of the ordinance, it violates § 12, art. 1, of the state constitution. This subject is fully discussed, and answered against appellant's contention, in the case of *State ex rel. Schafer v. Spokane,* 109 Wash. 360, 186 Pac. 864, and in *Allen v. Bellingham,* 95 Wash. 12, 163 Pac. 18, wherein ordinances not essentially unlike the one in the present case were considered. The argument of appellant, by way of illustration, that certain permits had been granted to others under this ordinance loses its value, for the reason that they were granted to auto stage lines connecting Seattle with outlying towns and sections—a class of service entirely distinct from the jitney bus business, such as these applicants desired permits for, as was well pointed out in the *Allen v. Bellingham* case; and the record shows that, in the recommendation of the committee on city utilities that was adopted by the city council (next to be discussed herein), it was determined to take all proper action to prohibit, if necessary, the auto stage licensees from operating as ordinary jitney busses within the city limits.

The applications here involved were placed in the hands of the superintendent of public utilities who, upon investigation, made a report thereon to the city council, which in turn referred the report to its committee on city utilities. The committee made an investigation and reported to the city council its recommendations (spoken of in the record here as a resolution), ''that all applications now pending be denied and that the reports of the superintendent of public utilities thereon be placed on file.'' It was further stated

in the report that, in making its recommendations that pending applications for jitney permits be rejected, "which applications were to serve sections of the city already supplied with adequate street car service," the committee wished it understood that *bona fide* applications for permits to serve districts now without street car facilities would be considered by the committee when received. The report of the committee was adopted by the council. It is argued that the adoption of the resolution was an attempt to change and modify the ordinance which the council, in that manner, had no power to do. It is evident, however, that the purpose and legal effect of its action with reference to the applications was to reject them, which it had the right to do under its general powers and the terms of the ordinance. Its manner of doing so by adopting the report of its committee making that recommendation was a matter wholly within the choice of the city council.

Lastly, it is contended that the ordinance is unconstitutional and void, being in contravention of that portion of the fourteenth amendment to the Federal constitution guaranteeing equality of rights. An adverse answer to the argument is found in the case of *State ex rel. Schafer v. Spokane, supra,* and the cases therein cited. We can see no Federal question in this case. Indeed, the argument that the ordinance undertakes to give arbitrary power to discriminate between persons of the same class is clearly met by the case of *Schoenfeld v. Seattle,* 265 Fed. 726, wherein one of the present intervening complainants attacked this same ordinance and, in addition to adopting our decisions with reference to the plenary powers of cities as to such users of the streets, it was held that the ordinance here in question violated no vested right to the use of

the streets for the carrying on of a private business
as a common carrier, and that the ordinance is not un-
reasonable, discriminating or arbitrary.

It may be further stated that, while these applica-
tions were pending, there were a number of confer-
ences, formal and informal, between the representa-
tives of the appellants and the committee on city util-
ities, concerning the routes applied for. The record
before us is indefinite as to the exact location of those
routes. It does appear, however, by abundant proof,
that the main controversy was over the establishment
of the termini of the routes with reference to traffic
in the congested business section of the city. The
testimony shows there was consideration or mention
by the committee of the plan of operating the jitney
busses from points removed several blocks from the
most densely traveled sections of the streets. To this
the appellants objected. One of the members of the
committee testified:

"As I recall, all these applications involved one prin-
ciple, that they wanted to come down town and we
wanted to keep them off those streets. There was no
chance for a compromise at that time and we could
not get together and this was decided on."

Other members of the committee testified similarly.
That is, it appears the city authorities were undertak-
ing to remedy a situation which the city had legisla-
tively found and declared to be unsafe to the public
peace, health, safety and welfare, by the enforcement
of an ordinance necessitated by that condition. The
controversy is one which calls in question the very
power of the city to control its streets, a question upon
which under the well-established rule in this state and
generally there can be no doubt. The city has that
authority and was engaged in the proper exercise of

it at the time this suit was brought. Such was manifestly the opinion of the trial court in entering the judgment which has been appealed from, and its judgment is hereby affirmed.

PARKER, C. J., MAIN, FULLERTON, and TOLMAN, JJ., concur.